IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:22-MJ-1086-RJ

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ISAURA M. SANDERS,<br><br>Defendant. | ORDER |

This matter comes before the court on Defendant Isaura M. Sanders' motion to dismiss the charges and to suppress evidence. [DE-18]. The Government responded in opposition to the motion, [DE-23], and the court held an evidentiary hearing on December 13, 2022, [DE-24, -25]. For the reasons that follow, the motion is denied.

## I. PROCEDURAL BACKGROUND

On May 20, 2022, Sanders was charged by criminal information with operating a motor vehicle upon a street, highway or public vehicular area with an alcohol concentration of .08 or greater at a relevant time after driving, to wit: an alcohol concentration of .12, in violation of N.C. Gen. Stat. § 20-138.1, as assimilated by 18 U.S.C. 13.[1] [DE-8]. On October 18, 2022, Defendant timely filed the instant motion to suppress, [DE-18], and as a result, the court continued the previously scheduled arraignment and bench trial pending ruling on the motion. [DE-20].

## II. STATEMENT OF FACTS

At the December 13, 2022 evidentiary hearing, the Government presented one witness, Malcolm Yazzie, who testified as follows. At the time of the events at issue, Yazzie was a military

---

[1] The offense is alleged to have occurred aboard Marine Corps Base, Camp Lejeune, within the Eastern District of North Carolina and the special maritime and territorial jurisdiction of the United States. [DE-1]. Defendant did not contest the court's jurisdiction over the alleged offense.

police officer ("MP") in the traffic unit of the Provost Marshal's Office ("PMO") of the United States Marine Corps at Camp Lejeune. He left active service in August 2022. Yazzie spent four and a half years in the PMO. He initially completed a three-month Military Police Academy and received additional training in 2019 from the National Highway Traffic Safety Administration ("NHTSA") in standard field sobriety test ("SFST") instruction, driving while impaired ("DWI") detection, and radar courses. The radar course was five days and included training on the dual Stalker radar unit, an additional eight hours of in-the-field training with a certified radar operator, and testing was required for certification. The State of North Carolina calibrates the radar units once a year, Yazzie tested his radar unit before the start of and after every shift, and he never experienced issues with a radar unit. The DWI detection SFST course and instructor course required twenty-four hours of classroom work on how to administer field sobriety tests, what to look for, the three phases of DWI detection, and all the clues and cues that are related to impaired driving. There was also a practical application portion of the training, and testing was required for certification. Yazzie was also trained as an instructor on SFSTs. A year later, Yazzie took the NHTSA Advanced Road Side Impaired Driving Enforcement ("ARIDE") course. Yazzie estimated he conducted approximately 2,000 or more traffic stops, utilized his radar unit approximately 1,600 to 1,700 or more times, investigated more than 100 suspected DWI cases, and made or was involved with more than eighty DWI arrests. Hr'g Tr. [DE-25] at 6:9–11:13.

On May 8, 2022, at approximately 2:00 a.m., Yazzie was patrolling in his vehicle on Camp Lejeune on Brewster Boulevard, which is marked and posted as a thirty-five mile per hour zone. There was no one on the roadway at that time, and a pair of headlights behind Yazzie caught his attention. As the headlights grew closer and brighter, Yazzie estimated the approaching vehicle's speed to be fifty miles per hour and activated his radar unit's back rear antenna. Yazzie

maneuvered his vehicle into the left lane, and the radar unit measured the approaching vehicle's speed at fifty-four miles per hour. Yazzie let the vehicle pass him, switched his radar to the front antenna, checked the speed again, and it registered at forty-five miles per hour. Yazzie did not see any break lights activated as the vehicle passed him. Yazzie then pulled into the right lane behind the vehicle and initiated a traffic stop. *Id.* at 11:14–15:18.

Yazzie activated his blue lights, exited his patrol car, and made contact with Sanders on the driver's side. When Sanders rolled down the window, Yazzie detected the odor of alcohol emanating from the vehicle. Sanders was only person in the vehicle. Yazzie began to question Sanders about where she was coming from and going to, and he requested her driver's license, registration, proof of insurance, and base access card. Sanders was calm, but Yazzie noticed her eyes were blood shot and watery, and he detected the consumed odor of alcohol as she was facing and speaking to him. Yazzie also noticed that when he asked Sanders for her base access card she was fumbling trying to find it but the card was on her driver's side door in the door handle pocket. Sanders said she came from a friend's house and was returning to base housing, and she admitted to consuming two or three glasses of wine about an hour and a half prior to being stopped. Yazzie felt he needed to make sure Sanders was able to drive the vehicle, so he brought her out of the vehicle to perform SFSTs. *Id.* at 15:13–19:15.

The field sobriety tests were conducted on the side of the roadway on level blacktop, free from debris, and well-illuminated. Yazzie administered three tests: the horizontal gaze nystagmus ("HGN"), the walk-and-turn, and the one-leg stand. *Id.* at 19:16–20:17.

Yazzie first administered the HGN test, which measures involuntary jerking of the eye, consists of three clues in each eye for a total of six clues, and four clues indicate impairment. Sanders was instructed on how the test would be administered, indicated she understood, and

3

affirmed she had no medical conditions that would prevent her from performing the test. Sanders demonstrated lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation, and onset nystagmus prior to forty-five degrees, all in each eye for a total of six clues. Yazzie determined Sanders' performance on the HGN test was unsatisfactory and indicated impairment. *Id.* at 20:21–23:18.

Yazzie next administered the walk-and-turn test, which requires the individual to walk a real or imagined straight line taking nine steps heel to toe with hands to their sides, to turn around, and then to walk in the same manner nine steps down the same line. There are eight clues and a minimum of two indicate impairment. Yazzie instructed Sanders, she indicated she understood, and she denied having a medical condition that would prevent her from performing the test. Yazzie described Sanders as "thirty-ish" years old and wearing comfortable clothing and shoes. They agreed on a straight imaginary line on the right shoulder of the road. Yazzie observed six of eight clues, including off balance, starting too soon, missed heel-to-toe steps, incorrect number of steps, improper turn, and using arms for balance. Yazzie determined Sanders' performance was unsatisfactory and indicated impairment. *Id.* at 23:19–26:23.

The last test administered by Yazzie was the one-leg stand, which requires the individual to stand with one leg approximately six inches off the ground, hands to sides, and count until directed to stop. There are four clues, and two clues indicate impairment. Yazzie instructed Sanders, she indicated she understood, and she denied having a medical condition that would prevent her from performing the test. Sanders demonstrated two clues, putting her foot down and using her arms for balance. Yazzie determined Sanders' performance was unsatisfactory and indicated impairment. *Id.* at 26:24–29:2.

Yazzie concluded based on his training, experience, and observations, as well as Sanders'

4

performance on the SFSTs, that Sanders had "consumed an appreciable amount of impairing substance so as to appreciably impair her mental and physical faculties to operate that motor vehicle." *Id.* at 29:3–16.

On cross-examination, Yazzie testified that he had been living at home since receiving an honorable discharge from the Marine Corps in August 2022, he had been working at a grocery store for about a month, and there was nothing preventing him from working in law enforcement. Yazzie confirmed that the certifications he received when he completed his training to investigate impaired drivers comported with North Carolina law, he had quarterly SFST refresher training in 2022, prior to the May 8 encounter with Sanders, and the State of North Carolina had calibrated his radar unit in February 2022. Yazzie affirmed that, pursuant to his procedure, he tested both antennas the night of May 8, and was assured from his training that they were functioning properly. Yazzie also indicated that of the roughly eighty DWI arrests he had made, there were no cases where probable cause was found to be lacking when the individual was taken to the station and administered a breathalyzer. *Id.* at 29:25–36:23.

Yazzie confirmed his prior testimony on direct regarding how he first noticed a vehicle approaching him from behind, estimated its speed, activated the radar, and recorded the speed before and after it passed Yazzie's patrol car. Yazzie indicated the vehicle was not weaving or crossing lines but was travelling too fast. He confirmed there was a nine mile per hour difference in the vehicle's speed before and after it passed and he saw no brake light activated, but he had no concern that the radar was not functioning properly. *Id.* at 36:24–39:20.

The vehicle pulled over on the side of the road when Yazzie activated his blue lights, and there were no issues with how Sanders pulled over. Yazzie initially noticed that Sanders wore contact lenses and had blood shot, watery eyes, but these facts, coupled with the early hour, did

5

not give Yazzie any concerns about administering the HGN test. Yazzie turned off his blue lights before administering the test but the white illumination light remained on. Sanders was standing between her vehicle and Yazzie's patrol car and she was facing him, perpendicular from the road, when the test was conducted. *Id.* at 39:21–46:21.

Yazzie's practice is to ask, before starting the walk-and-turn test, if the individual has any leg, ankle, or knee injuries or anything else that will prevent them from doing the test. Sanders did not stop walking during the test, did not step off the line going out or coming back, and took the appropriate number of steps out but took one too many coming back. Yazzie was unaware if Sanders had taken the walk-and-turn test before, but he would not expect an average person to be familiar with the test instructions and acknowledged an individual would be nervous while performing the test. *Id.* at 43:6–48:14.

Yazzie clarified that for the one-leg stand test he utilizes a timer, he has the individual count out loud until he tells them to stop, and the individual chooses which leg to stand on. Sanders did not sway left or right, did not hop to the left, but did put her foot down one time and used her arms for balance. Yazzie also clarified that "utilizing an arm" did not mean putting it against the patrol vehicle but did indicate she lifted her arm higher than six inches, and he instructs them not to use their arms at all and to keep their arms down by their side. Yazzie confirmed that he decided to arrest Sanders for DWI after administering the tests. *Id.* at 48:15–49:23.

On redirect, Yazzie testified he was pursuing employment with the North Carolina State Highway Patrol. He confirmed that prior to the traffic stop he was traveling thirty-five miles per hour, the posted speed limit, on Brewster Boulevard. Yazzie estimated it was ten to fifteen seconds from the time he observed Sanders' headlights until she was close enough to recognize his vehicle as a marked patrol car. Yazzie also noted that in his training and experience a vehicle could

6

decrease speed by adjusting the cruise control or letting off the gas pedal in addition to breaking. *Id.* at 50:5–52:21.

## III. DISCUSSION

Defendant raised several issues in her motion but at the hearing she clarified that she was only challenging whether there was reasonable suspicion for the stop and probable cause for the arrest. *Id.* at 3:5–5:6.

### A. The Traffic Stop

Defendant contends Yazzie lacked reasonable suspicion to execute a traffic stop, arguing that the evidence calls into question whether his radar equipment was functioning properly. *Id.* at 52:10–53:19; Def.'s Mot. [DE-18] at 1. The Government contends Yazzie had reasonable and articulable suspicion for the traffic stop based on observing Defendant's speeding violation. Gov't's Mot. [DE-23] at 4–6.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment, *Whren v. United States*, 517 U.S. 806, 809–10 (1996), and therefore, is "subject to the reasonableness requirement of the Fourth Amendment," *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). When an officer observes a traffic violation, even a minor one, it is permissible to stop the vehicle. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993).

Yazzie credibly testified that he stopped Sanders' vehicle after he observed her driving at an estimated fifty miles per hour in a thirty-five mile per hour zone and verified that she was speeding with his radar unit. Hr'g Tr. [DE-25] at 13:14–14:7, 39:14–17. Sanders attempts to call into question the validity of the radar reading by arguing that it was not reasonable for her speed

7

to decrease by nine miles per hour from the first to the second radar reading when Yazzie did not see any break lights. This challenge is not supported by the evidence of record.

Yazzie credibly testified that he was driving thirty-five miles per hour, the posted speed, when he noticed a pair of headlights behind him that were getting closer and brighter, and Yazzie estimated that Sanders was driving fifty miles per hour, fifteen miles per hour over the posted speed limit. *Id.* at 13:14–18. Yazzie also testified that in order to obtain his certification, he was required to ride along with another radar operator for eight hours and accurately estimate other people's speed on the roadway. *Id.* at 8:5–16. The Fourth Circuit has explained that "the reasonableness of an officer's visual speed estimate depends, in the first instance, on whether a vehicle's speed is estimated to be in significant excess or slight excess of the legal speed limit. If slight, then additional indicia of reliability are necessary to support the reasonableness of the officer's visual estimate." *United States v. Sowards*, 690 F.3d 583, 591 (4th Cir. 2012). Yazzie's trained observation that Sanders was driving well in excess of the posted speed, coupled with the fact that Yazzie was driving the posted speed and Sanders' vehicle was closing on him, is sufficient to establish that Sanders was driving in excess of the posted speed and to provide probable cause to stop the vehicle. *See United States v. Mubdi*, 691 F.3d 334, 340–41 (4th Cir. 2012) (finding no error in conclusion that defendant was speeding based on findings that officers were trained in estimating vehicle speeds and that their testimony regarding defendant's rate of speed was credible), *cert. granted, judgment vacated on other grounds,* 570 U.S. 913 (2013); *Sowards*, 690 F.3d at 591 ("[W]here an officer estimates that a vehicle is traveling in significant excess of the legal speed limit, the speed differential—i.e., the percentage difference between the estimated speed and the legal speed limit—may itself provide sufficient 'indicia of reliability' to support an officer's probable cause determination.").

8

Yazzie also confirmed his belief that Sanders was speeding by utilizing his radar unit. *See United States v. Ochoa*, 539 F. Supp. 3d 504, 510 (E.D.N.C. 2021) (noting that "law-enforcement officers use radar equipment and pacing methods to confirm their suspicions that a vehicle is speeding prior to stopping the vehicle"). Yazzie initially checked Sanders' speed with his radar unit before she passed him and her speed registered at fifty-four miles per hour. Hr'g Tr. [DE-25] at 13:14–21. After Sanders passed Yazzie he checked her speed again and it had decreased to forty-five miles per hour. *Id.* at 13:23–14:4. Yazzie did not see Sanders' break lights illuminate after she passed his patrol car. *Id.* at 39:4–11. Sanders argues that it is unreasonable to conclude Sanders' speed reduced by nine miles per hour in such a short distance and time absent breaking and that the circumstances point to a malfunctioning radar. *Id.* at 53:2–19. However, Yazzie credibly testified, based on his training and experience, that an individual could reduce speed without breaking by adjusting the cruise control or simply letting off the gas pedal. *Id.* at 51:13–21. The nine mile per hour differential is not so great as to create doubt as to whether the radar until was properly functioning. Yazzie was an experienced and well-trained MP in the traffic unit. He was certified to operate his radar unit and tested it before and after every shift. *Id.* at 7:11–9:10. Yazzie also testified that the radar unit had been calibrated by the State of North Carolina in February 2022, just three months prior to the events at issue. *Id.* at 34:8–15. Yazzie estimated he conducted more than 2,000 traffic stops, he utilized his radar unit approximately 1,600 to 1,700 or more times, and he never experienced any issues with the radar. *Id.* at 9:11–9:20. Accordingly, there was sufficient evidence that Sanders was speeding to establish probable cause for the stop.

### B. The DWI Arrest

Defendant contends that, given the totality of the circumstances, there was no probable cause to arrest her for impaired driving. *Id.* at 53:20–55:24. The Government counters that

9

Defendant demonstrated several signs of impairment that provided probable cause for an arrest. *Id.* at 56:13–57:17.

An arrest is a seizure of the person, and a warrantless arrest is only reasonable if it is supported by probable cause. *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001). "According to well-established federal and state law, probable cause is defined as 'those facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information which are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *State v. Parisi*, 372 N.C. 639, 649–50, 831 S.E.2d 236, 243–44 (2019) (quoting *State v. Williams*, 314 N.C. 337, 343, 333, S.E.2d 708, 713 (1985)). "Whether probable cause exists to justify an arrest depends on the 'totality of the circumstances' present in each case." *Id.* (citing *State v. Sanders*, 327 N.C. 319, 339, 395 S.E.2d 412, 425 (1990)).

The North Carolina General Statutes provide in relevant part that "[a] person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within the State . . . [w]hile under the influence of an impairing substance; or . . . has, at any relevant time after the driving, an alcohol concentration of 0.08 or more . . . or [has] any amount of a Schedule I controlled substance . . . in his blood or urine." N.C. Gen. Stat. § 20-138.1(a). An impairing substance includes alcohol. N.C. Gen. Stat. § 20–4.01(14a). "A person is under the influence of an impairing substance when he has taken (or consumed) a sufficient quantity of that impairing substance to cause him to lose the normal control of his bodily or mental faculties, or both, to such an extent that there is an appreciable impairment of either or both of these faculties. N.C.P.I.-Crim. 270.20; N.C. Gen. Stat. § 20–4.01(48b); *United States v. Naallah*, No. 5:15-MJ-01016-RN, 2016 WL 1267164, at *3 (E.D.N.C. Mar. 31, 2016).

10

The totality of the circumstances supports a finding that there was probable cause to arrest Sanders. When Yazzie first made contact with Sanders and she rolled down her window, he could detect the odor of alcohol emanating from the vehicle, and Sanders was the sole occupant. *Id.* at 17:25–18:4. Yazzie acknowledged her demeanor was calm when he started questioning her, but he also noticed that she had bloodshot, watery eyes and he again detected the odor of alcohol as she was facing Yazzie and speaking to him. *Id.* at 18:4–11. Yazzie also noticed that Sanders was "fumbling" while trying to locate her base card but it was readily accessible in the driver's side door handle pocket. *Id.* at 18:12–19. Sanders told Yazzie she consumed two or three glasses of wine about an hour and a half prior to the encounter. *Id.* at 18:20–22, 19:8–10. Sanders' performance on all three field sobriety tests was poor and indicated impairment. She exhibited six of six clues on the HGN test (four indicate impairment); six of eight clues on the walk-and-turn test (two indicate impairment); and two of four clues on the one-leg stand test (two indicate impairment). *Id.* at 22:7–17, 23:9–18, 24:21–25:4, 26:15–23, 27:20–28:2, 28:18–29; *accord United States v. Rowland*, No. 7:18-MJ-1124-RJ, 2018 WL 6683305, at *3 (E.D.N.C. Dec. 19, 2018) (holding the court may properly consider HGN test evidence in its probable cause determination in the context of a suppression hearing). Yazzie concluded, based on his observations, training, and experience, that Sanders was appreciable impaired in her mental and physical faculties to operate a motor vehicle. *Id.* at 29:3–16.

Sanders argues that the manner in which she was driving did not indicate she was impaired, i.e., she was driving in the proper lane, staying in her lane, not touching the fog or center lines, and responded appropriately to the blue light; she was naturally nervous after being pulled over by law enforcement late at night having had a couple of glasses of wine; and the early morning hour could account for her watery, bloodshot eyes. These facts do not undermine Yazzie's conclusion, based

11

on the facts before him as outlined above, that Sanders was appreciably impaired. *See State v. Lindsey*, 791 S.E.2d 496, 501 (N.C. Ct. App. 2016) (holding that there was probable cause to arrest the defendant when there was an odor of alcohol coming from the Defendant, Defendant had red and glassy eyes, the officer observed six out of six HGN clues, and the Defendant admitted drinking).

Sanders' attempts to undermine the results of the field sobriety tests also fail. Sanders asks the court to discount the HGN test because she was wearing contacts but Yazzie testified that he had no concern her contacts would prevent him from obtaining accurate results, Hr'g Tr. [DE-25] at 43:22–44:1, and Sanders presented no evidence to rebut Yazzie's testimony. Sanders also contends Yazzie did not inquire about any naturally occurring nystagmus or eye condition, and did not seriously inquire about Sanders' medical conditions that might impact the walk-and-turn test. However, Yazzie testified that he asked Sanders, prior to each of the three tests, whether she had any medical conditions that would prevent her from performing, and she responded no. *Id.* at 23:1–5, 25:15–19, 28:13–17. Finally, Sanders argues that the tests were unfamiliar, she was cooperative, and she tried to do her best. Even taking into account her nervousness and best efforts to perform the tests, Sanders performance was poor where she demonstrated all six clues on the HGN test and six of eight clues on the walk-and-turn, well more than the minimum needed to indicate impairment. *See Parisi*, 372 N.C. at 656, 831 S.E.2d at 247–48 (finding officer had probable cause to arrest where defendant performed poorly on multiple field sobriety tests, smelled moderately of alcohol, had red and glassy eyes, and had admitted to drinking three beers). Accordingly, there is sufficient evidence to support a finding of probable cause for the arrest.

## IV. CONCLUSION

For the reasons stated herein, Defendant's motion, [DE-18], is denied. The parties shall

12

confer and contact the deputy clerk regarding a date to reset the arraignment and bench trial in this matter.

So ordered, this the 8th day of February, 2023.

Robert B. Jones, Jr.
United States Magistrate Judge